UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOP FLIGHT, INC., et al.,

       Plaintiffs,

v.

CITY OF INKSTER,

       Defendant.

_____/

Case No. 06-12399

Honorable Nancy G. Edmunds

## ORDER GRANTING IN PART AND DENYING IN PART
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [14]

Pending before this Court is Plaintiffs'[1] Motion for Preliminary Injunction, filed on December 29, 2006.  Plaintiffs challenge Defendant City of Inkster's Cabaret Ordinance, Inkster, Mich., Code § 113.187 (2006), *et seq.* (the "Ordinance," future citations to the Ordinance will appear as § 113.___).  (Def.'s Resp., Ex. 503.)  The Ordinance regulates certain types of adult entertainment establishments and the performers who work at such businesses.  To maintain consistency with the Ordinance, the following defined terms will be used through this Order to describe those particular businesses and employees that are covered under its provisions:

CABARET. Any place wherein food and/or any type of alcoholic or non-

_____

[1]The named plaintiffs consist of the following: Top Flight, Inc., Hamilton's Henry the VIII Lounge, Inc., and Hamilton's Bogarts, Inc., three corporations that rent space to expressive dancers, and Kathleen Polzin, Miranda McBride, and Tammy Anderson, three individuals who are expressive dancers that rent space from the corporate plaintiffs.  Plaintiffs assert that the named individual plaintiffs also represent all other dancers and performers who are similarly situated.

1

alcoholic beverages are sold or given away on the premises and the establishment utilizes or features topless dancers, strippers, male or female impersonators or similar entertainers and the operator thereof holds a yearly license from the state to sell such beverages by the glass, and where the patrons are provided with entertainment or space for dancing.[2]

PERFORMER. Any topless dancer, stripper, male or female impersonator or similar entertainer.

§ 113.189.  Customers of Cabarets will be referred to as patrons.

Plaintiffs claim that the ordinance violates their First, Fourth and Fourteenth Amendment rights under the U.S. Constitution, pursuant to 42 U.S.C. § 1983.[3]  For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for preliminary injunction.

## I.  FACTS

Defendant has had a city ordinance regulating adult entertainment establishments (the "Ordinance") on its books for a number of years, but had not sought to enforce the Ordinance until 2006.  Defendant claims that this is because it relied upon state and county enforcement efforts to control such businesses prior to that time.  In May 2006, however, Defendant asserts that it became concerned that county enforcement might no longer be sufficient, and decided to amend the Ordinance.

Like many other similar ordinances enacted by other municipalities around the country, Defendant's Ordinance is designed to address harmful secondary effects

---

[2]As used in this Order, the term Cabaret also encompasses the separately defined entities that are called Club Cabarets in the Ordinance.

[3]Plaintiffs also claim that their Fifth Amendment rights have been infringed, but this amendment only applies to actions of the federal government.  As Plaintiffs do not name any federal entities as defendants, their Fifth Amendment claims are hereby dismissed and the Court will issue a separate order to that effect.

known to be associated with adult entertainment businesses, such as prostitution, increased crime and reduced property values in the areas surrounding these types of establishments.  Plaintiffs counter that the true reason for enforcing the Ordinance is a desire to increase Defendant's revenues by raising the Cabaret license fee and requiring Performers to pay an annual identification card fee.  They assert that Defendant's police chief and mayor made these motivations clear at two separate meetings with Cabaret owners that took place during the spring of 2006.

After additional discussions between the parties, and on December 4, 2006, Defendant adopted the version of the Ordinance that is the subject of Plaintiffs' motion for preliminary injunction presently before this Court.  (Def.'s Resp., Ex. 503.)  Prior to this action, Defendant consulted several studies and cases from other municipalities that addressed the secondary effects underlying Defendant's statement of purpose for the Ordinance.  (Def.'s Resp., Ex. 508.)  Defendant's police chief also prepared a report of the expenses related to enforcement of the Ordinance to support the Performer's identification card fee.  (Def.'s Rep., Ex. 504.)

Among the additions to this version of the Ordinance from the pre-2006 language were the aforementioned statement of purpose, a required permit card for new Performers who were auditioning with a Cabaret, and various modifications to the appeals processes for decisions to deny a Cabaret owner's license or Performer's identification card.  At this time, Defendant has agreed that it will not enforce the Ordinance while the instant judicial review is pending.

## II.  STANDARD OF REVIEW - MOTION FOR PRELIMINARY INJUNCTION

The availability of injunctive relief is a procedural question that is governed by

3

federal law.  *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir. 1991).  The Sixth

Circuit has held that a court must consider four factors in deciding whether to issue a

preliminary injunction:

1. whether the movant has established a substantial likelihood or probability of success on the merits;

2. whether the movant has demonstrated a threat of irreparable harm;

3. whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. whether the public interest is served by the issuance of an injunction.

*Nighclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000).  The foregoing

factors should balanced.  *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.

1985).  Where the three factors other than the likelihood of success all strongly favor

issuing the injunction, a district court is within its discretion in issuing a preliminary

injunction if the merits present a sufficiently serious question to justify a further

investigation.  *Id.* at 1230.  Alternatively, the court may also issue a preliminary

injunction if the movant "at least shows serious questions going to the merits *and*

irreparable harm which decidedly outweighs any potential harm to the defendant if an

injunction is issued."  *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir.

1985) (citations omitted).

A plaintiff must always show irreparable harm before a preliminary injunction may

issue.  *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir.

1982).  "The basis of injunctive relief in the federal courts has always been irreparable

harm and inadequacy of legal remedies."  *Sampson v. Murray*, 415 U.S. 61, 88 (1974)

(citations omitted).  When First Amendment rights are implicated, however, "the crucial

4

inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits.  This is so because . . . the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute."  *Nightclubs*, 202 F.3d at 888.

## III.  ANALYSIS

### A.  Success on the Merits

#### 1.  First Amendment challenges

"'Nude dancing of the type at issue here is expressive conduct,' which falls 'within the outer ambit of the First Amendment's protection.'" *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County*, 274 F.3d 377, 391 (6th Cir. 2001) (hereinafter "*Deja Vu I*") (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000)). The First Amendment applies to state and local governments via the Fourteenth Amendment.  Plaintiffs assert that the Ordinance is unconstitutional under the First Amendment because it: (1) is an unlawful prior restraint, (2) unreasonably burdens protected expression, (3) is overbroad, (4) enables the release of personal information, (5) the alleged secondary effects that it is designed to address are mere pretext, (6) it improperly prohibits otherwise lawful freedom of association, (7) the application process contains unconstitutional elements, and (8) the Performer's identification card fee is an impermissible tax on protected expression.

#### a. Prior restraints

"'A 'prior restraint' exists when speech is conditioned upon the prior approval of public officials,' and any system of prior restraint carries a heavy presumption against its

5

validity." *Deja Vu I*, 274 F.3d at 391 (quoting *Nightclubs*, 202 F.3d at 889). Since the Ordinance requires Cabarets to be licensed in order to operate, and mandates that Performers obtain an audition permit card or permanent identification card before dancing at a Cabaret in Inkster, the Ordinance operates as a prior restraint.

In order to survive constitutional review despite its existence as a prior restraint, the Ordinance must (1) provide for a decision granting or denying the license "within a specified, brief period, and the status quo must be preserved pending a final judicial determination on the merits," (2) ensure a "prompt judicial decision," and (3) "place the burden of instituting judicial proceedings and proving that expression is unprotected on the licensor rather than the exhibitor." *Id.* at 400 (citing *Freedman v. State of Maryland*, 380 U.S. 51, 58-59 (1965)). In the Sixth Circuit, ordinances which regulate "sexually oriented businesses . . . must incorporate at least the first two *Freedman* procedural safeguards" to be constitutional. *Id.* at 401.

Plaintiffs argue that §§ 113.192(A)(9), 113.192(B)(7) and 113.194(B) are unlawful prior restraints because they do not provide adequate judicial review of Defendant's decisions to deny a Cabaret owner's license application. Plaintiffs also assert that § 113.199(B), which covers a Performer's right to appeal the denial of a performer's identification card, is unconstitutional for the same reason.[4]

### i. Cabaret owner's license

Plaintiffs claim that §§ 113.192(A), 113.192(B) and 113.194(B) of the Ordinance

---

[4]As the Ordinance treats the class of Cabaret owners separately from the class of Performers for purposes of applying for the requisite license or identification card, the Court will do the same here.

6

fail under *Freedman* because (1) the City Council has no deadline for issuing its decision on an appeal challenging the denial of a new or renewing license under § 113.194(B), (2) there is no provision for preserving the status quo on appeal of a denial decision under §§ 113.192(A) (new license applications and renewals of existing licenses) or 113.192(B) (decisions to revoke an existing license), and (3) prompt judicial review is unavailable.

Contrary to Plaintiffs' contention on the first point, the Ordinance provides that Defendant must make a final decision on an appeal "within 14 days of the completion of the hearing [before City Council]."  § 113.193(4).

Moving to the second issue, § 113.192(B)(7) is facially unconstitutional, as that provision explicitly denies a stay of Defendant's decision to revoke an existing license under the objective circumstances listed in §§ 113.192(B)(1) through (6), and limits the availability of a stay for decisions based upon subjective criteria listed in § 113.192(B)(7) to situations where Defendant does not file for a declaratory judgment within 14 days of the decision.  Since the status quo for a licensed Cabaret is the ability to remain operating, and this status quo is not maintained in all circumstances, Plaintiffs have a likelihood of success on the merits in arguing that § 113.192(B)(7) is an unconstitutional prior restraint.

As Defendant notes, the Ordinance contains a severability provision in § 113.207, so the invalidity of  any particular provision does not doom the Ordinance as a whole. That said, the appeals process is such an integral part of Plaintiffs' right to challenge an adverse licensing decision that it is impossible to sever § 113.192(B)(7) from the rest of that subsection.  Thus, any injunction must enjoin § 113.192(B) in its entirety.

7

Resolution of this issue with regards to § 113.192(A), which governs decisions denying a new license or renewal of an existing license, requires a more detailed discussion. The penultimate paragraph of § 113.192(A)(9) provides for the status quo to continue pending appeal of Defendant's failure to renew an *existing* license. Although that section does not maintain the status quo for *new* Cabarets seeking a license for the first time, the Ordinance is not necessarily unconstitutional because of this discrepancy. Since new applicants would be non-operational at the time of the application, the status quo at that point would be not operating. *Bronco's Entm't, LTD v. Charter Twp. of Van Buren*, 421 F.3d 440, 447 (6th Cir. 2005).

Regardless of the holding in *Bronco's*, there is a class of Cabarets whose rights are not adequately addressed by the Ordinance, to wit, existing Cabarets that will have to apply for a license once the Ordinance becomes effective. By definition, these establishments would not qualify as renewing an existing license, and would therefore not have the right to continue operating on appeal under the current language of § 113.192(A)(9). Such Cabarets would have some protection under the final sentence of § 113.190, which states that "[a] Cabaret . . . in operation at the time this Ordinance is adopted shall be considered a licensed Cabaret . . . if it submits an application for a license within 30 days of the effective (sic) of this Ordinance . . . [and] may continue in operation pending the review of the license application." The exclusion of any language referring to an appeal subsequent to this review indicates that the status quo could be interpreted to stop when the review process concluded.

By limiting application of this provision to only the time when the review of an operating Cabaret's application is pending, however, the license appeal provisions of §

8

113.192(A)(9) would govern, and an operating Cabaret would not have the right to continue operating once the license review ended and an actual appeal began.  Thus, Plaintiffs are likely to succeed on the merits that § 113.192(A)(9) is an unlawful prior restraint because the status quo would not be maintained for an operating Cabaret applying for its first license under the Ordinance.  As with § 113.192(B)(7), § 113.192(A)(9) is so intertwined with § 113.192(A) as a whole that it may not be severed individually.

While § 113.192(A)'s constitutionality necessitated a good deal of discussion, there is a simple solution.  If Defendant modifies the final clause of § 113.190 in a manner similar to: "said Cabaret or Club Cabaret may continue in operation pending the review of the license application*, or any subsequent appeal*," § 113.192(A) would satisfy the constitutional requirements for prior restraints.

Lastly, prompt judicial review of decisions regarding Cabaret licenses is available under the Ordinance.  In *Bronco's*, 421 F.3d at 447, the Sixth Circuit noted that the Michigan Court Rules provide numerous avenues for expedient hearings on declaratory relief as well as trials and appeals, and held that this satisfied the second prong of *Freedman*.  Since the Ordinance provides for appeal of Defendant's final decisions before the Michigan Circuit Court under §§ 113.192(A)(9), 113.192(B)(7); and 113.193(5), a Cabaret owner seeking appeal is provided with sufficient judicial review for the Ordinance to pass constitutional muster.[5]

---

[5]Plaintiffs also argue that the Ordinance is unconstitutional because § 113.194(B) states that the City Manager's decision to deny a Cabaret owner's license may only be reversed upon "material and substantial evidence," and the "City Manager can for whatever reason deny the license as long as the reason(s) is (sic) in writing."  (Pls.' Mot.

### ii. Performer's identification card

Plaintiffs challenge § 113.199(B), covering performer identification cards, and argue that this provision violates both requirements for a prior restraint to be constitutional–that it does not allow the status quo to continue pending appeal, and does not afford proper judicial review.  The relevant portion of § 113.199(B) is as follows:

> [Once an applicant has filled out an application and paid the required fee, t]he Police Department shall issue an annual cabaret performer's identification card . . . on a temporary or probational basis for 14 days in order to provide the Police Department with time to conduct a reasonable investigation.  During said 14-day period, the Chief of Police or his designee may revoke any temporary cabaret performer's identification card without a hearing based upon [a number of objective reasons] listed within subsection (D) below; provided, that any person . . . having said card revoked may appeal to the City Manager within five days of notice of said revocation, using the procedures set forth in Section 113.193 . . . provided, further, that the decision of the Chief of Police shall be upheld unless the City Manager determines that there is material and substantial evidence on the record as a whole that the chief abused his discretion in refusing to issue or in revoking such identification card.  The filing of an appeal from the revocation of a temporary cabaret performer's identification card shall not stay the revocation, however, the filing of an appeal shall stay the revocation of an existing annual performance identification card.  The decision of the City Manager shall constitute a final decision.

As with the provisions discussed above that apply to Cabaret license applications, this language properly maintains the status quo for both new Performers (status quo is not dancing) and existing Performers seeking renewal of their identification card (the revocation is stayed pending appeal).  *See Bronco's*, 421 F.3d at 447.  The same

---

for Prelim. Inj. at 6-7.)  The Court need not address the first argument, as Plaintiffs provide no authority to support the proposition that it is unconstitutional to require this level of evidence in order to reverse the City Manager's decision.  Plaintiffs' second assertion is unfounded, as proper judicial review exists per the above discussion.

problem exists with regards to existing Performers who will need to apply for an identification card once the Ordinance becomes enforceable, however. Contrary to existing Cabaret owners who are protected by § 113.190's 30-day grace period, that section does not afford existing Performers a concomitant right. Therefore, Plaintiffs have a likelihood of success on the merits with the argument that § 113.199(B) is an unconstitutional prior restraint.[6]

While a finding that § 113.199(B) does not maintain the required status quo is enough to conclude that it is likely to be found unconstitutional, addressing the judicial review argument remains necessary, because a deficiency in either area would result in this section being unconstitutional. Although § 113.199(B) invokes § 113.193, which incorporates proper judicial review of Defendant's decisions before the Michigan Circuit Court, § 113.199(B)'s final sentence is completely contrary when it states "[t]he decision of the City Manager shall constitute a final decision." If anything, the specific statement of the last sentence in § 113.199(B) should be interpreted to preclude reference to § 113.193's general appeal provisions, which would make § 113.199(B) unconstitutional on this additional ground as well.[7]

In summary, Plaintiffs are likely to prevail on the merits by arguing that §§ 113.192(A), 113.192(B) and 113.199(B) of the Ordinance are unconstitutional prior

---

[6]This deficiency would be remedied by incorporating an addition to § 113.190 extending the grace period for the length of any appeal, as noted in the previous section of this Order, along with including existing Performers as parties that are protected by that section.

[7]As further support of this interpretation, § 113.193 only mentions licenses, and not performer identification cards.

11

restraints.

### b. Restrictions on simulated sexual acts

Plaintiffs claim that § 113.195(C) is an unconstitutional restriction on protected speech, as this subsection does not pass the strict scrutiny analysis that applies to content-based restrictions. They also argue that this provision is overbroad.

### i. Burden on protected expression

Plaintiffs challenge the following portions of the Ordinance:

(C) [any operator of a Cabaret shall not] Permit any of the following conduct, either by patrons or employees:

(1) The performance of acts, or simulated acts, of sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, or any sexual acts which are prohibited by law.

(2) The actual caressing or fondling of the breast, buttock, pubic region or genitals.

* * *

§ 113.195(C).[8] In arguing that intermediate scrutiny is the proper level of analysis here, Defendant cites to the Sixth Circuit's opinion in *Deja Vu I*, where that court noted:

We have previously recognized that ordinances aimed at regulating adult entertainment businesses constitute content-based regulations, but that "a distinction may be drawn between adult [businesses] and other kinds of [businesses] without violating the government's paramount obligation of neutrality" when the government seeks to regulate only the secondary effects of erotic speech, and not the speech itself.

274 F.3d at 391 (quoting *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 440 (6th Cir.

---

[8]As Defendant notes, Plaintiffs' objection can only encompass the prohibition against the *simulation* of acts contained in subsection (C)(1), as well as performers being restricted from touching *their own* body parts under subsection (C)(2). Clearly, any municipality has the right to prohibit actual sexual contact between patrons and performers without running afoul of the First Amendment.

12

1998)).  The *Deja Vu I* court applied a four-part intermediate scrutiny analysis from *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968), to a challenged provision of an ordinance which prohibited any individual convicted of a "crime of a sexual nature" from receiving a license or permit to work in an adult entertainment business.  The court held that this restriction satisfied the requirements of intermediate scrutiny because keeping applicants with past criminal convictions from working in sexually-oriented establishments furthered the legitimate government interest of reducing the likelihood of criminal behavior occurring at these businesses, while only placing an incidental burden on protected First Amendment activities.

Contrary to the provision at issue in *Deja Vu I*, however, §§ 113.195(C)(1) and (2) directly inhibit the range of actions that a Performer can employ during their performance.  Therefore, this subsection operates as a content-based restriction that must pass strict scrutiny in order to be found constitutional.  "[R]egulations designed to restrain speech on the basis of its content are subject to strict scrutiny and are presumptively invalid under the First Amendment."  *Schultz v. City of Cumberland*, 228 F.3d 831, 840 (7th Cir. 2000) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)).  "To survive strict scrutiny, the provision must be necessary to serve a compelling state interest and be narrowly drawn to achieve that end."  *Id.* at 848 (citing *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991)).

In *Schultz*, the city of Cumberland, Wisconsin enacted an ordinance that was nearly identical in many respects to § 113.195(C).  Among other restrictions, the Cumberland ordinance prohibited "a person who knowingly and intentionally, in a

13

sexually oriented business, appears in a state of nudity or depicts specified sexual activities." *Id.* at 837.  That ordinance defined the term "specified sexual activities" to include "'the fondling or other erotic touching of the human genitals, pubic region, buttocks, anus, or female breasts'; 'sex acts, . . . actual or simulated, including intercourse, oral copulation, masturbation, or sodomy.'" *Id.* at 836-37.  In short, the relevant portion of Cumberland's ordinance was equal to § 113.195(C) in all material respects.

The *Schultz* court upheld the Cumberland ordinance's anti-nudity provision, but held that the portion restricting actual and simulated sex acts did not survive strict scrutiny review, and thus violated the First Amendment because it unreasonably burdened protected expression.

> [The Cumberland ordinance] deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance and thereby interferes substantially with the dancer's ability to communicate her erotic message. . . . Unlike a simple prohibition on full nudity, [the Cumberland ordinance] does much more than inhibit "that portion of the expression that occurs when the last stitch is dropped."

*Id.* at 847 (quoting *Pap's A.M.*, 529 U.S. at 294).

Given the similarity between the Cumberland ordinance and § 113.195(C), the Court is inclined to conclude that the Ordinance's relevant subsection also fails to comport with the requirements of the First Amendment under strict scrutiny analysis. Defendant argues, however, that § 113.195(C) is distinguishable from the one in *Schultz* due to the fact that the Cumberland ordinance included the additional provision prohibiting all nudity, while the Ordinance's proscriptions do not extend this far.  First of all, this position disregards the fact that the *Schultz* court actually upheld the nudity ban

14

portion of that ordinance while striking the portion that aligns with the Ordinance at issue here.  Secondly, the existence of additional language in the Cumberland ordinance that was found to be constitutional does not speak to the constitutionality or unconstitutionality of other portions of that ordinance that were analyzed separately.  Thus, Defendant's attempts to distinguish *Schultz* fail.  As Defendant has not proffered any persuasive reasoning for disregarding the reasoning in *Schultz*, § 113.195(C) does not withstand strict scrutiny analysis, and Plaintiffs' challenge on this issue has a likely chance of success on the merits.

### ii. Overbreadth

As an alternative ground for invalidating § 113.195(C), Plaintiffs claim that this provision is impermissibly overbroad.  "A law is overbroad under the First Amendment if it 'reaches a substantial number of impermissible applications' relative to the law's legitimate sweep."  *Deja Vu I*, 247 F.3d at 387 (quoting *New York v. Ferber*, 458 U.S. 747, 771 (1982)).  The overbroad doctrine serves to strike a law that imposes "restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose . . . ."  *Id.*

In support of their argument that § 113.195(C) is overbroad, Plaintiffs cite two cases, but both of these, as well as *Deja Vu I*, lead to the conclusion that § 113.195(C) does not meet the definition of the term.  In *Odle v. Decatur County*, 421 F.3d 386, 392 (6th Cir. 2005), the Sixth Circuit found that an ordinance prohibiting "nudity and the performance of a wide range of arguably sexually suggestive acts in 'public place[s] where intoxicating liquors [ ] are offered for sale, served or consumed'" was impermissibly overbroad.  Key to the court's holding was the fact that "the definition is

15

so broad that it is effectively all-encompassing, exempting only restrooms, showers, medical facilities, motel rooms and the like, modeling classes . . . and state-licensed 'family-oriented clothing optional facilit[ies]'-places, one would imagine, where performances needing the protection of the First Amendment do not often occur." *Id.*

Plaintiffs also cite *Ways v. City of Lincoln*, 247 F.3d 514, 516 (8th Cir. 2001), where the Eighth Circuit held that a challenged ordinance was overbroad because the list of proscribed conduct included that which could "reasonably be construed as being for the purpose of sexual arousal or gratification of either party or any observer." The *Ways* court noted that the challenged provision could extend to such benign things as kissing between stage actors in a regular play, an ice skater lifting another by the buttocks, or a production that includes nudity, but could not be considered an adult film, such as *Hair*.[9] For that reason, the court found the language at issue to be overbroad.

Similarly, in *Deja Vu I*, the Sixth Circuit construed the definition of prohibited "sexually oriented [material]" to be "unconstitutionally overbroad." 274 F.3d at 387. There, the list of proscribed actions included "*any* exhibition of *any* motion pictures, films or videos depicting 'specified sexual activities' or 'specified anatomical areas.'" *Id.* (emphasis added). Since this definition could easily encompass "a range of expression that does not cause the secondary effects that the Ordinance was aimed to prevent, it [was] overbroad." *Id.* at 388.

When compared to these three cases, the conduct that the Ordinance prohibits is not so broad that it is likely to extend to activities which are incapable of producing the

---

[9]As Justice Souter posited concerning the film *Hair. See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 585 n.2 (1991) (Souter, J., concurring).

16

secondary effects that the Ordinance is designed to combat.  While there may be some

confusion over exactly what conduct is covered by the Ordinance's proscription of

simulated sexual acts, the definition of the types of establishments governed by the

Ordinance is sufficiently circumscribed that the language challenged here does not

exhibit the same potential of overreaching that the ordinances did which were struck in

*Odle*, *Ways* and *Deja Vu I*.  Therefore, Plaintiffs are not likely to succeed on the merits

with their argument that § 113.195(C) is overbroad.

### c.  Disclosure of personal information

Next, Plaintiffs claim that  Defendant should be enjoined from disclosing any of

their personal information that is required to be submitted on an application, out of a

concern for their safety and well-being.  § 113.199(C) of the Ordinance specifically

provides that this information will be exempt from Michigan's Freedom of Information

Act pursuant to Mich. Comp. Laws § 15.243(1)(b)(iii) (allowing an exemption for

information collected for an investigative purpose that would "constitute an unwarranted

invasion of personal privacy" if released publicly).  In *Deja Vu I*, the Sixth Circuit upheld

the collection of similar personal information by finding that the items fell within an

exception to Tennessee's Open Records Act, and ordering that the municipality not

publicly disclose the information.  274 F.3d at 394-95.  Therefore, the Ordinance is not

unconstitutional on the grounds that dancers must provide personal information in order

to obtain a license.  Defendant does not object to an injunction being issued that orders

any personal information collected under the Ordinance not to be disclosed under the

Michigan Freedom of Information Act, so the injunction issued under this Order will

include this provision.

17

### d. Secondary effects

Next, Plaintiffs challenge the stated purpose of the Ordinance, listed in § 113.187, claiming that the secondary effects it is now designed to ameliorate are mere pretext, as this language did not appear in the versions of the Ordinance existing before May 2006. The simple fact that the earlier versions of the Ordinance did not include a statement of purpose, while the December 2006 version does, is insufficient to prove that Defendant does not have a legitimate basis for the purposes now listed, however.

This issue arises because local governments can enact ordinances that incidentally affect protected speech without violating the First Amendment, so long as the primary purpose of the ordinance is to address undesirable effects of the speech that fall within the municipality's police powers.  Typically, the secondary effects related to adult entertainment establishments that such ordinances are designed to address include prostitution, increased crime and decreased property values in the areas surrounding these types of businesses.  Stating the precise parameters of a municipality's burden to support its asserted secondary effects is difficult, however, due to the splintered nature of the leading Supreme Court opinions in this area of law.

While a municipality could certainly undertake its own study of local conditions to create support for a desired ordinance, this is not required, as "[t]he First Amendment does not require a city . . . to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses."  *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986).  There, the Court held that Renton's consultation of a study produced by the nearby city of Seattle satisfied its

18

burden on this point.  In *City of Erie v. Pap's A.M.*, 519 U.S. 277, 297 (2000), the Court

expanded this rationale somewhat in upholding Erie's ordinance by noting that the adult

establishment at issue there was "of the same character as the adult entertainment at

issue" in a number of other Supreme Court cases that involved both zoning restrictions

and ordinances that proscribed certain types of activities within such establishments.

(citing *Renton*, 475 U.S. 41; *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976);

*California v. LaRue*, 409 U.S. 109 (1972)).  This portion of *Erie* indicates that there are

certain secondary effects associated with adult entertainment businesses generally and

that a municipality need not complete a study that specifically addresses the type of

restriction they seek to enact in their particular ordinance.

A municipality's initial burden on secondary effects is relatively low, but the Court

has indicated that there is a limit to what information is acceptable:

> This is not to say that a municipality can get away with shoddy data or
> reasoning. The municipality's evidence must fairly support the municipality's
> rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale,
> either by demonstrating that the municipality's evidence does not support its
> rationale or by furnishing evidence that disputes the municipality's factual
> findings, the municipality meets the standard set forth in *Renton*. If plaintiffs
> succeed in casting doubt on a municipality's rationale in either manner, the
> burden shifts back to the municipality to supplement the record with evidence
> renewing support for a theory that justifies its ordinance.

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-39 (2002).  Thus, there

is also an element of burden shifting, in that a plaintiff can successfully rebut the

municipality's initial claims by bringing a sufficient amount of contrary evidence of its

own.

At oral argument, Plaintiffs presented the testimony of Mr. Alan Markavitz, owner

of Plaintiff Flight Club, Inc., and Mr. Edward Gardocki, a vice president of the

19

partnership that owns both Plaintiff Hamilton's Henry the VIII Lounge, Inc. and Plaintiff Hamilton's Bogarts, Inc.  Each man testified that property tax assessments for their particular establishments have risen continuously over the years, there is significant new development in the immediate surrounding areas, no blight is present, and the Inkster police have not notified them of any increased crime related to their businesses. Plaintiffs assert that this testimony sufficiently "cast[s] doubt" on Defendant's asserted secondary effects, such that the burden now shifts back to Defendant to produce additional evidence to support their claim that secondary effects exist, per *Alameda Books*.

A recent opinion out of the Eleventh Circuit casts some light on the type of evidence that is necessary to satisfy a plaintiff's rebuttal burden here.  In *Peek-a-Boo Lounge of Bradenton, Inc. v. Manatee County*, 337 F.3d 1251, 1270-73 (11th Cir. 2003), the court engaged in a lengthy review of applicable Supreme Court precedent before concluding that the plaintiffs successfully shifted the burden back to the municipality. The *Peek-a-Boo* plaintiffs produced "a two-volume 'Appendix . . .' which it had previously submitted to the Manatee County Planning Commission during the public hearings the Commission held," and "three expert studies specifically addressing local conditions in Manatee County which purported to show that there was no evidence connecting their businesses with negative secondary effects."  *Id.* at 1270.

Although Plaintiffs have produced some evidence to show that Defendants asserted secondary effects do not exist with regard to their particular establishments, the Court believes that this type of anecdotal, lay witness testimony is insufficient to override the relatively minimal burden placed on Defendant compared to the evidence

20

on the record in *Peek-a-Boo.*  This is especially so after *Renton*, which did not require any proof of localized secondary effects.[10]  Furthermore, the instant case is at the preliminary injunction stage, where the applicable standard is likelihood of success on the merits, rather than an actual trial, where the merits would be actively litigated before a full resolution.  Without additional evidence to support Plaintiffs' claim that no such secondary effects exist in relation to their businesses, Defendants have a likelihood of success on the merits on this issue at the present time.

Nothing in this particular Opinion should be read to limit Plaintiffs' ability to produce their own reports or expert testimony regarding local conditions at any trial in this case, however.  It simply means that Plaintiffs have not met the burden necessary to enjoin the Ordinance due to Defendant's asserted secondary effects constituting mere pretext.

### e.  Freedom of association

Plaintiffs also challenge § 113.195(I), which prohibits employers from allowing "employees, including dancers and entertainers, to eat, drink, solicit drinks or otherwise mingle with the patrons," claiming that this infringes on a Performer's right to free association.

---

[10]The Court's research also uncovered two district court cases that quoted Justice Souter's concurring opinion in *Barnes* and held that "legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects."  *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 114 F. Supp. 2d 531, 546 (N.D. Tex. 2000); *J.L. Spoons, Inc. v. City of Brunswick*, 49 F. Supp. 2d 1032, 1044 (N.D. Ohio 1999) (both quoting *Barnes*, 501 U.S. at 582 (Souter, J., concurring)).  While this is an appealing line of reasoning, it suggests that even proof that no localized effects existed might be insufficient to counter a municipality's stated purpose.  The Court believes that such an interpretation would effectively render *Alameda Books*' burden shifting language nugatory, and thus is not prepared to adopt this position here.

In upholding an ordinance that restricted patrons from entering a three foot "buffer zone" surrounding the stage during a dancer's performance, the Sixth Circuit noted that:

> the First Amendment protects the entertainers and audience members' right to free expressive association. They are certainly engaged in a "collective effort on behalf of shared goals." The dancers and customers work together as speaker and audience to create an erotic, sexually-charged atmosphere, and although society may not find that a particularly worthy goal, it is a shared one nonetheless. The right to associate for expressive purposes, however, is not absolute. "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."   In attempting to restrict opportunities to engage in prostitution and to guard against the spread of disease through the public release or exchange of bodily fluids, Metropolitan Nashville has gone no farther than necessary by requiring a three-foot distance between the erotic dancer and the audience.

*Deja Vu I*, 274 F.3d at 396-97.  The *Deja Vu I* court specifically rejected the plaintiffs' argument that the ordinance created a "floating buffer zone" around the dancers, and noted that "[c]ustomers [remained] free . . . to tip dancers before or after their performances."  *Id.* at 397.  This reasoning eliminated the plaintiffs' contention that the ordinance at issue there improperly limited dancers' ability to be compensated for the exercise of rights under the First Amendment.

*Deja Vu I* is not directly on point here, however, as the Ordinance is both less restrictive and more restrictive than the three foot "buffer rule" in the former litigation. On one hand, § 113.195(I)'s restrictions only apply to the specific activities of eating, drinking, or mingling with customers, so the challenged language is less restrictive in that it does not apply to *all* contact with entertainers during their performance.  On the other hand, § 113.195(I) does not contain any temporal limitation to narrow its scope to the period of the actual performance, so the Ordinance's sweep is at the same time

22

more broad than the one at issue in *Deja Vu I*.

Plaintiffs do not specifically challenge the particular prohibition against eating, drinking or soliciting drinks from patrons, and a relatively minimal restriction on permissible contacts between entertainers and customers, such as this, does not unconstitutionally limit the exercise of Plaintiffs' right to protected speech.  Even without being able to fraternize with customers over food and drink, Performers would still have plenty of opportunities with which to express their erotic message in the shared atmosphere that the Sixth Circuit recognized as protected in *Deja Vu I*.

The inclusion of mingling as a prohibited activity raises potential issues, however, as the Ordinance's present language bans all contact of this sort between Performers and patrons at Cabarets.  In arguing that this provision passes constitutional muster, Defendant cites *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1061-62 (9th Cir. 1986), where the Ninth Circuit upheld the relevant portions of a local ordinance requiring that all dancing had to occur on a raised stage at least ten feet from customers and prohibited customers from tipping dancers.  The *Kev* court noted that:

> [w]hile the dancer's erotic message may be slightly less effective from ten feet, the ability to engage in the protected expression is not significantly impaired.  Erotic dancers still have reasonable access to their market. Similarly, while the tipping prohibition may deny the patron one means of expressing pleasure with the dancer's performance, sufficient alternative methods of communication exist for the patron to convey the same message.

*Id.* (citations omitted).  For its part, the Sixth Circuit has not shown a willingness to embrace a complete ban on tipping, however.  The *Deja Vu I* court's discussion of dancers' ability to receive tips seems to suggest that, at least in this circuit, receiving tips is an integral part of a performer's entitlement to "compensation for the exercise of

23

First Amendment rights."  274 F.3d at 397.

Although the Ordinance does not directly prohibit patrons from tipping a Performer after their performance, mingling could be defined broadly enough to limit this type of behavior.  "Mingle" is defined as "to move about (as in a group) *<mingled* with the guests>."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 741 (10th Ed. 1999).  Therefore, if Defendant chooses to enforce this provision broadly and prohibit contact between Performers and patrons for the purposes of tipping both during *and* after performances, the Ordinance would appear to violate Sixth Circuit dicta in *Deja Vu I*.  Therefore, Plaintiffs have shown a likelihood of prevailing on the merits as to the prohibition against mingling with patrons under § 113.195(I).

### f. Audition permit cards

Plaintiffs assert that a number of features of the permitting process for Performers are unconstitutional.  In general, the Ordinance provides for a two-step licensing procedure for prospective Performers.  An individual who merely wants to audition for a position at a Cabaret must secure a valid audition permit card from Defendant pursuant to § 113.199(E).  This card is issued without charge, and allows the individual to audition at any Cabaret within the city for a period of five days.  To obtain the card, an individual must provide their legal name, picture ID, stage name, date of birth, height, weight, and certify that they have not had a performer's license revoked within the past two years.  An individual can receive one audition permit card every six months.  Alternatively, the prospective Performer could decide to apply for a full performer's

24

identification card from the outset, and bypass the audition permit card entirely.[11]

Plaintiffs challenge the following factors of the audition permit card arrangement: (1) that Defendant has no governmental interest in any individual Performer's performance skills, and therefore has no legitimate basis for requiring auction permit cards, and (2) that an audition candidate can only obtain one audition card every six months.[12]

The second issue deserves no further discussion, as Plaintiffs' brief does not explain why the six month period is unconstitutional.  Furthermore, a prospective performer who had obtained an audition permit card within the past six months could always apply for a full performer's card in order to be able to dance immediately without waiting for the whole six-month period to end.

As to the first argument, Defendant provides adequate support for the audition permit card by noting that auditions for new dancers take place during normal business hours, so, absent an audition permit requirement, there would be no way for an inspector to verify whether an individual Performer was truly "just auditioning," or whether they were dancing on a regular basis without obtaining an identification card under the Ordinance.  Therefore, the audition permit cards are an integral part of Defendant's ability to enforce the Ordinance, and Plaintiffs' challenges to the audition

---

[11]The performer's identification card requires several additional steps: payment of an application fee (currently $200.00), disclosure of further personal information and consent to a criminal background investigation.

[12]Plaintiffs argue that an aspiring Performer must also complete the application for a full performer's identification card in order to receive an audition permit card.  The language of the Ordinance plainly refutes this position.

card requirements under § 113.199(E) are without merit.

### g.   Performer's identification card fee

Pursuant to §§ 113.190 and 113.199(C) and Resolution 06-05-104, dated May 3, 2006, (Def.'s Resp., Ex. 506) Defendant's required fees are $500.00 for a Cabaret owner's license and $200.00 for a Performer's identification card.  Plaintiffs limit their challenge to the identification card fee, claiming that this amount is an unconstitutional burden on a Performer's free speech rights since the fee is sufficiently large to constitute an unlawful tax on protected expression.  In support, Plaintiffs cite a concurring opinion from *Alameda Books*, and three district court cases from outside the Sixth Circuit where various courts found similar licensing schemes to be unconstitutional.[13]

When a municipality mandates the payment of a fee for an individual to obtain a required license in order to engage in activities that incorporate fundamental rights, a constitutional issue arises, as "[i]t could hardly be denied that a tax laid specifically on the exercise of [First Amendment] freedoms would be unconstitutional."  *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943).  "A state may not impose a charge for the enjoyment of a right granted by the federal constitution."  *Id.* at 113.  On the other hand, this does not mean that the Constitution bans all fees that are related to an individual's exercise of protected rights.  So long as the license fee is nominal and is set at a level which "meet[s] the expense incident to the administration of the act and to the

---

[13] *See AAK, Inc. v. City of Woonsocket*, 830 F. Supp. 99 (D.R.I. 1993); *Wendling v. City of Duluth*, 495 F. Supp. 1380 (D. Minn. 1980); and *Bayside Enters. v. Carson*, 450 F. Supp. 696 (M.D. Fla. 1978).

26

maintenance of public order in the matter licensed[, t]here is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated." *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). *See also Murdock*, 319 U.S. at 116.

Several of Plaintiffs' cited cases are either taken out of context, as is the citation to Justice Kennedy's concurrence in *Alameda Books*, or can be easily distinguished from the instant case. As to Plaintiffs' district court cases, the ordinance at issue in *AAK* did not even include a statement of purpose listing secondary effects it was aimed at addressing, and this was a key factor in the court's holding that the ordinance was unconstitutional. 830 F. Supp. at 103-04. Here, however, the Ordinance has a statement of purpose in § 113.187. In *Wendling*, the fee charged under the subject ordinance covered administrative costs of both the adult bookstore licensing program as well as enforcement of an unrelated obscenity ordinance. 495 F. Supp. at 1385. As Defendants are not using administrative costs of other objectives beyond the licensing arrangement at issue here to justify the Ordinance's fee levels, *Wendling* is inapplicable to the instant case as well.

Although not directly on point, *Bayside Enterprises* provides the closest authority to the resolution of this issue. There, the defendant supported its license fees with a study showing that administrative expenses of enforcing the ordinance totaled nearly $300,000 in the first year and just over $200,000 annually thereafter. In enjoining the associated fee as unconstitutionally high, the court noted that the figures included the addition of two sergeants and ten police officers to monitor the thirty six adult establishments that would be covered by the ordinance. Finding that it was not reasonably necessary to have one new police officer for every three adult businesses,

27

the court held that "the City's evidence was simply inadequate to justify the high costs imposed by the Code on those seeking a license to disseminate materials which are presumptively accorded first amendment protection." *Bayside Enters.*, 450 F. Supp. at 705-06.

In the instant case, Defendant's Police Department produced an analysis of the Ordinance's projected administrative expenses based upon the expected number of applications per month. (Def.'s Resp., Ex. 504.) This analysis concludes that the total cost per Performer is $116.00 for police personnel to review the license or identification card application, conduct a background search, make periodic inspections during the year, and provide for other administrative needs, such as a digital camera, computer, and office materials. All of these tasks are legitimately related to enforcing the Ordinance, and Plaintiffs do not quarrel with any particular line item in Defendant's analysis.

Although not elucidated with any detail in their briefs, Plaintiffs complain that the Ordinance's fees are unconstitutionally high and should be enjoined on this ground. After a review of Defendant's analysis of costs, the Court agrees. There is an $84.00 surplus between the estimated costs of administration and the fee for each Performer. Defendant's analysis explains that this allows "for any overtime or an extension of time that may be utilized to complete any of the above tasks." (Def.'s Resp., Ex. 504 at 5.) This is excessive, as it is unreasonable to assume that overtime costs would exceed the expected costs of administration by nearly 75%. On this ground alone, Plaintiffs have a likelihood of success in arguing that the part of § 113.199(C) requiring payment of a $200.00 identification card fee is an unconstitutional tax on protected expression.

28

In addition, the analysis includes a number of tasks that must be performed by police personnel, and in nearly all cases, the administrative cost of the program includes the time for two individuals to perform each task.[14]  The Court does not see how the services of two police officers could possibly be required for these tasks, which are mostly menial in nature, without further explanation by Defendant.  Assuming, as the Court believes, that these costs are duplicative, the average annual expense to monitor each Performer would decrease from $116.00 to approximately $82.00.

### 2.  Fourth Amendment challenge

Departing from freedom of speech issues, Plaintiffs next challenge § 113.202 of the Ordinance, which mandates that:

> The operator or person in charge of any cabaret shall at any time open every portion of any cabaret or club cabaret for inspection by the Police Department or other City departments for the purpose of enforcing any of the provisions of this subchapter, this code or any applicable ordinance of the City.  Said inspections may occur at any time during regular business hours, or as otherwise provided by law.

Plaintiffs argue that this requirement violates the Fourth Amendment, as it effectively opens up any and all portions of their establishments to inspection by local authorities without a warrant.  Defendant responds that there is no warrant requirement for searches of that part of an owner's premises that are open to the public, and that the final clause "or as otherwise provided by law" saves this provision from being unconstitutional.  The Court disagrees.  Although this Court is not aware of any Sixth Circuit precedent that has firmly decided this issue, the parties cite several district court

---

[14]This includes matters such as application review, background checks, fingerprinting, data entry, database updates and supervisory dancer checks.

29

cases from this circuit, and an examination of their holdings leads to the conclusion that Plaintiffs are likely to prevail on their argument that § 113.202 is unconstitutional.

First, a Nashville, Tennessee ordinance providing "for unlimited inspections, at reasonable times" was constitutional, "*to the extent that* these inspections [were] limited to the part of the premises open to the public." *Ellwest Stereo Theater, Inc. v. Boner*, 718 F. Supp. 1553, 1577 (M.D. Tenn. 1989) (emphasis added). The court ended up enjoining enforcement of the ordinance at issue in *Ellwest* on other grounds, however.

An Ohio district court judge enjoined enforcement of the inspection provisions contained in another similar ordinance that limited inspections to any time the establishment "is occupied or open for business," because it failed to restrict that inspection to areas of the premises where members of the public had access. *J.L. Spoons, Inc. v. City of Brunswick*, 49 F. Supp. 2d 1032, 1039-41 (N.D. Ohio 1999).

Next, in *Kentucky Restaurant Concepts, Inc. v. City of Louisville*, 209 F. Supp. 2d 672, 691 (W.D. Ky. 2002), the court found that an ordinance limiting inspections to the public areas of an adult establishment still warranted issuing an injunction under the reasoning of *Ellwest* because the ordinance at issue did not provide any temporal limitations. The court held that "the addition of one simple phrase-'at reasonable times'-would remove the potential Fourth Amendment implications." *Id.* The language of *Kentucky Restaurant* also indicates that "limiting inspections to business hours" would have had a similar effect in bringing the ordinance within constitutional parameters.

Finally, while the particular issue was not on appeal before the Sixth Circuit in *Deja Vu of Cincinnati, LLC v. Union Twp. Bd. of Trustees*, 411 F.3d 777, 796 (6th Cir. 2005), that court noted that the district court below enjoined the enforcement of an ordinance

30

providing for inspections "at all reasonable times," but forced owners to grant "access to any and all parts of the premises."

Under the reasoning of the above cases, the Ordinance now before this Court provides the temporal restriction necessary by limiting inspections to "regular business hours," but is likely to violate the Fourth Amendment due to the requirement that an owner "open *every portion* of any cabaret or club cabaret for inspection." § 113.202 (emphasis added). Therefore, Plaintiffs have a likelihood of success by arguing that § 113.202 violates the Fourth Amendment.[15]

### 3. Fourteenth Amendment challenges

Plaintiffs' final arguments fall under Fourteenth Amendment protections. Specifically that (1) the Ordinance unconstitutionally limits a Performer's right to earn a living, and (2) it subjects Cabaret owners to liability without knowledge that a violation of the Ordinance is occurring.

### a. Right to earn a living

Plaintiffs claim that § 113.198 is unconstitutional because it prohibits Performers from working in another capacity, "including, but not limited to, the selling of cigarettes, photographing patrons, waiting tables, bartending or hat-checking at the same cabaret [where they are employed as a performer, dancer or entertainer]." In support of this argument, Plaintiffs cite *Adams v. Tanner*, 244 U.S. 590 (1917). This position is without merit, however, as *Adams*, and a number of other *Lochner*-era cases striking down

---

[15]As noted in *Kentucky Restaurants*, however, this provision would be valid with the additional limitation that warrantless inspections are only permitted in those portions of a Cabaret where members of the public have access.

state laws on a due process theory of freedom of contract, were expressly abrogated in *Lincoln Federal Labor Union No. 19129 v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 536-37 (1949), and other earlier cases cited in that opinion.  Thus, Plaintiffs have no likelihood of success to invalidate § 113.198 on this ground.

### b.  Operator liabiltiy

Lastly, Plaintiffs assert that § 113.204 is unconstitutional because it imposes liability on premises owners regardless of their knowledge of a violation of the Ordinance, as "[a]ny operator is hereby made responsible and accountable for a violation of this subchapter occurring on the licensed premises by any of his agents or servants, whether or not such violation is committed with his knowledge."  Unfortunately, neither party makes a persuasive argument on this point.

For their part, Plaintiffs merely claim that "[s]uch a provision is unconstitutional," and cite to *Deja Vu I*, 274 F.3d at 398.  The cited portion of that opinion discussed liability of performers and owners, but in each case, the Sixth Circuit held that the provisions at issue there were *not unconstitutional* on these grounds.  Therefore, Plaintiffs' citation is curious at best, and does not support their position on this issue.

In response, Defendant cites a Michigan Court of Appeals case which concluded that the holder of a state liquor license was presumed to have control of their premises, and therefore imposed liability for underage drinking even though the owner did not have actual knowledge that a minor was consuming alcohol.  *Town & Country Lanes, Inc. v. Liquor Control Comm'n*, 446 N.W.2d 335 (Mich. Ct. App. 1989).  That may be the law in Michigan with regards to liquor licenses, but nothing in § 113.204 implicates Michigan liquor license law or Liquor Control Commission rules in setting the

32

appropriate standard for an owner's liability under the Ordinance, nor does Defendant single out another portion of the Ordinance that does this.

Regardless, Plaintiffs bear the burden of convincing this Court of its likelihood of success on the merits in order to obtain an injunction, and Plaintiffs have not met this burden with regards to the issue of § 113.204.

### B. Irreparable Harm

As discussed previously, the primary inquiry when considering a request for injunction implicating First Amendment rights is whether the plaintiff has shown a likelihood of success on the merits, because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Since Plaintiffs have shown a likelihood of success on the merits with several of their First Amendment challenges to the Ordinance, they have also established that enforcement of the Ordinance will cause irreparable harm.

### C. Harm to Others

Plaintiffs admit in their motion for preliminary injunction that "[g]ranting a preliminary injunction will not cause substantial harm to others." (Pls.' Mot. at 18.)

### D. Public Interest

As with the issue of irreparable harm, this Court agrees with Plaintiffs' assertion that  prevention of constitutional violations is in the public interest, so this factor of the analysis is met here.

On balance, a preliminary injunction enjoining Defendant from enforcing those particular sections of the Ordinance listed below is warranted.  Plaintiffs have

established a likelihood of prevailing on the merits with regards to those sections, enforcement of the relevant parts of the Ordinance would irreparably harm Plaintiffs due to the First Amendment rights at stake, and the public interest would be served by granting an injunction.

## IV.  CONCLUSION

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders that Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART.

Defendant is enjoined from enforcing §§ 113.192(A), 113.192(B), 113.195(C)(2), 113.199(B) and 113.202 in their entirety.  The specific portions of the following sections are also enjoined: § 113.195(C)'s prohibition against simulated acts, § 113.195(I)'s prohibition of Performers mingling with patrons, and § 113.199(C)'s requirement that Performers pay a fee to apply for a performer's identification card.  Finally, Defendant is enjoined from releasing any personal information collected as a result of its enforcement of the Ordinance under the Michigan Freedom of Information Act, as provided in § 113.199(C).

SO ORDERED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  February 26, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of

34

record on February 26, 2007, by electronic and/or ordinary mail.

                                        s/Carol A. Hemeyer
                                        Case Manager